Good morning. We now have argument in the case of Landry v. Berry. I recognize that Mr. Berry is the appellant here, but before we begin, I want to clarify the status of the plaintiff, if you will, and the substitution of his power of attorney individual. And I'm wondering if you can tell us the motion you filed, whether that was served on Mr. Berry's counsel, and if you can tell us the status of your client and your understanding of the status of the motion. Please. And we don't need to run any time clock on this part. Thank you, Your Honor. Diane Valancourt on behalf of Malcolm Landry and the proposed substituted party is Myra Almond. My client is currently in the hospital. There was a period where we filed the motion where it looked like he was on a path to improvement. He actually went into a nursing home, and we thought, you know, the next step might be assisted living. He was at all times, though, unable to continue with the litigation. Since then, we checked on him yesterday, and he is back in the hospital and in terrible shape. He is conscious, but his condition is as dire as ever. So opposing counsel was served with that motion. It was part of the report. And I just talked with opposing counsel, and he does not object. Let me ask you this. We're, of course, sorry to hear about your client's condition, but it seems unusual that you could substitute someone as a party when they don't have any, when the event didn't happen to them. It's one thing to assign a claim, for example. So I'm wondering what the authority is to substitute her as the actual plaintiff. It's Federal Rule Civil Procedure 43A. Oh, excuse me. I got the wrong book. And Mr. Landry, that's Federal Rule Civil Procedure 25B. All right. And then also Federal Rule Civil Procedure 17C grants the court the power to protect the interests of incompetent persons. And Mr. Landry is at present incompetent. And he's not anticipated to be other than incompetent. But you cite in your motion what 43A, 43B, for substitution of a party. And then you also, I'm noticing in there, I'm confused because you say that Ms. Almond then, as a party, would be able to be deposed and cross-examined as if she would, you know, testify on his behalf. And clearly she can't testify on his behalf. I mean, she would only have hearsay knowledge of anything. I mean, she has nothing to do with anything. So I'm really, well, it's just I question whether this is, that you could do this. I mean, you know, I see where you're saying that she would have the power if they wanted to settle the lawsuit or durable power of attorney, but to substitute as the actual plaintiff. And then I'm wondering if he, you know, God forbid if he passes away, does this even survive him? That's a good question, Your Honor. Well, I was hoping you all would know as opposed to censure the lawyers in this. And just to factor into that, if he's disabled or incompetent or he dies, I guess your remaining evidence is the deposition taken by the opposition. Because following up on Judge Callahan, he can't testify to the extent that might come in as a statement of a party under oath. That would be the only testimony, correct? Could you please repeat that? Yeah. With respect to Mr. Landry, his only preserved testimony is the deposition, correct? That is correct. Your Honor, the deposition, since the hearing of before, I've reviewed the deposition and also taken a very intense review at the totality of the case as will come out in oral argument. And we have a firm belief the case can proceed. Okay. Now, the reason we said that Ms. Allman could testify is Ms. Allman knew Mr. Landry up to the point that he took this trip and she saw him and his condition as soon as he returned from the trip. So she would just be basically a fact witness? She would be basically a fact witness about his condition immediately preceding the incident at issue and immediately after the incident at issue. And that is the limit of what she would be able to add to the case. But then she's also, you're saying she's durable power of attorney and then you want to substitute her as a plaintiff even though she's a witness? I'm looking at Section 43A and B and I'm trying to figure out if she really can be substituted as a plaintiff. Well, at this stage, she is Mr. Landry's representative. Should he die in the course of this litigation, there will have to be a court proceeding. There is no executor of the estate. There is a holographic will but no executor. So you don't know whether a 1983 cause of action survives death? Pardon? You don't know whether a 1983 action Yes, it definitely does. Absolutely does. And we've done this before, unfortunately. And you're saying the other side does not oppose substituting Ms. Almond in? Right. As a plaintiff? As a plaintiff. It would be Myra Almond on behalf of Malcolm Landry. Can we hear from the other side just on that briefly? Mr. Hamilton? Yes. Good morning, Your Honors. Excuse me. David Hamilton representing Mike Berry. I've never been in this situation myself, frankly. I don't really know the answer to the question. But when counsel applied to substitute, first to have a durable power of attorney and then to substitute another person as the plaintiff, I looked up the rules. I saw no reason to oppose it. I didn't see any authority that really precisely answered the question. But you represent someone. And if you don't really know the answer, why would you agree? I couldn't find any law that said that they couldn't do it. And therefore, for purposes of appeal at least, I thought I would not oppose it. Now, if this case goes back down for trial, I don't know whether there's going to be any authority that will really answer that question. But I may look for it at that point.  Correct. All right. Thank you. Why don't you retrieve your papers, and we'll start with the argument with respect to qualified immunity. Thank you very much. Good morning, and may it please the Court. We are here today essentially on an issue of qualified immunity. Qualified immunity essentially has two paths to it. The first path is that the defendant can prevail if he can show there was no constitutional violation. If the Court finds in this case that there was probable cause for a 5150 hold, then the defendant is entitled to qualified immunity. The second path is if the Court can't resolve that question or decides there was no probable cause based on the record, they can go to the qualified immunity issue, where the question is whether there was clearly established law putting the officer on notice that his conduct in the situation he faced was unconstitutional, would have violated the Constitution. And I think the principal error, a legal error made by the district court, and why he denied qualified immunity to Mr. Berry, is that the district court failed to follow the law of this circuit and give the officer the benefit of rational inferences from the evidence that he had in front of him. The Court's reasoning below was that he had, Officer Berry had taken the plaintiff's car away, had impounded his car, thereby depriving him of the ability to drive. In the district court's view, that removed any danger to either Mr. Landry or himself. Well, could the officer have just left him there after he took his car away? What was the officer's, what was he faced with at that point? If after, if you follow, apparently it seems undisputed that there have been 911 calls earlier in the day of the erratic driving. He'd gone to the, he was taken to the hotel, said to stay there, and then he took off again. There was damage to the car. Now, there are disputes in certain facts as to what exactly happened, but if, so we have to give, we have to deal with, you know, give everything that Mr. Landry says, you know, for purposes of the motion, assume it to be true, and then what are undisputed. But so at the point that he, they're not disputing that he could impound the car, right? Correct. Okay, so he impounded the car, so he's just supposed to leave Mr. Landry by the roadside? Or what are officers' duties at that point? What was the officer's dilemma? Judge Callahan, I think that goes to the heart of this case. That is exactly the issue that we have here with what the district court did. The district court never reached the issue of, well, what do we do with this gentleman once his ability to drive is taken away? Well, you see, the problem with that, and I'm sympathetic, the problem with that is just because you don't know what to do doesn't mean you can take somebody in on probable cause under 5150. I mean, that's a very specific thing. And so let's take it step by step. If he takes the car away, is there anything in this record that would support a danger to others? Well, I think that's a rational inference, but more of a question. Well, the question is yes or no, and what is it? Is there anything in this record, once the car is taken away, that supports an inference that he's a danger to others, not to himself but to others? I think the answer to that question is yes. Okay, and what are those facts? The facts are, I think, the same that would show him to be a danger to himself. The question that Judge Callahan asked a moment ago goes right to that, which is we have here it's dark, it's raining, Mr. Landry walks with a walker, he breathes through an oxygen tank. The answers he gave to the officer were perceived by the officer as him being lost and confused. And how would that be a danger to others? Let's split this up, danger to others, danger to self. How would it be a danger to others? Let's suppose that the officer had said, okay, I've got his vehicle, good night, Mr. Landry, good luck. Well, in that case, he's by the side of a highway at night, lost and confused. You can imagine this man losing his way, walking out in front of a car. That could be a danger to other motorists. It would certainly be a danger to Mr. Landry. Well, here's the question. Is there any, simply because somebody is basically elderly and confused, is the only choice a 5150 or nothing? That's my question. That's a very good question. And my answer to that is that I think the officer's choice is to act reasonably. That's what the case law says. Okay, let's go back and try to answer the question, and then you can make up your explanation. Is there any other choice at that point other than a 5150 in your view? Based on the facts the officer was presented with, I don't think there was any other choice for him. Just to back up for a moment, would the officer have the authority to impound the vehicle if he hadn't made the 5150 determination? Under what would be the basis for impounding it? Yes, the vehicle code section that was cited, subsection G, provides that in a case of illness or injury where a driver is incapacitated, the vehicle can be taken in under the community caretaking doctrine. So the statute provides that authority. However, I think the parties spent a lot of time in the vehicle. Well, does 5150 require both a danger to others and yourself, or is it a disjunctive? It's disjunctive, Your Honor, either one. Either he would present a danger to himself or a danger to other people. Either one provides a ground for a 5150 custody situation. So the officer is saying, based on the dispatch, that the issue with him is his erratic driving. So we definitely have to get him off the road, right? I think everyone kind of agrees with that. Would the officer have the ability to impound the car because of the erratic driving? Your Honor, I don't actually know the answer to that question. Since the vehicle code section he used refers to illness or injury, I would think he'd have to have probable cause for some illness or injury to impound the car. And so the question here is whether, if that would be the basis for it, whether the illness amounted to a mental incapacitation that would allow action under 5150. Is that the issue? Yes, that's right. And the question there was either the officer had probable cause for 5150, which we think the record establishes that, even if not, or if there are questions remaining about that, did the officer act in a way that violated clearly established law? And that's the second prong of the qualified immunity question. And I was about to say also that the parties spent a lot of time trying to figure out the timing of events and whether the car was impounded before or after the 5150 determination was made. Frankly, in preparing for this argument, I came to the conclusion that it really doesn't matter, because what the district court missed is that the officer is entitled to make his judgment based on the facts that he knows, firsthand or secondhand, plus rational inferences from those facts. So the fact that Mr. Landry obviously could not control his car, is not capable of driving safely, is one part of that calculus. But in addition, what the officer is presented with is this man, as I described, who is obviously in pretty poor health, seems mentally confused, is lost. And the question arises, if he takes his car away, well, what happens to him then? The rational inference the officer drew is that he's not going to be able to take care of himself. He can't provide for his own safety, whether he's driving or not. The officer knows that previously he was taken to a hotel, told to stay there, get someone to come and get him, and he didn't do it and got back in his car. Correct. So this is like a normal probable cause where, in effect, those officers' knowledge is also imputed to him, right? I think that's correct. His secondhand knowledge that was provided through dispatch is the ultimate. He gets to add that to his probable cause determination. Exactly. But he actually, he was informed of that, right? Was he informed of this incident at the hotel by the dispatcher? He was. Yeah. He had actually, the officer, Barry, was on duty all day, and the radio traffic that he heard told him about, he kept hearing calls about this car. The calls from the 9-11 callers went to dispatch. Dispatch puts out bulletins to the officers, be on the lookout. And most of those calls, almost all of them, specifically described the car and gave his license number. So Officer Barry said he had all this in his mind. He knew something was going on. And then the final 9-11 calls at about 8-15 that evening came in, and the officer was in a geographical position where he could respond, and he had several calls, either cell phone calls or radio calls with dispatch, and he got further information. Among the information he got was clarification on what he'd heard earlier in the day about Mr. Landry being taken to a hotel by the Garberville officers, described by them as severely disabled, left there because they thought he could not safely drive, and then shortly thereafter he is back in his car and is driving. Let me ask you why, you know, when you take somebody in on a 5150, you kick in to play all kinds of procedures, as you know. Why couldn't you just take him to the hospital and say, without 5150, to simply say, I think this gentleman, you know, may need some medical treatment and take him to an emergency room? Well, he actually did that. I know he did that, but he's saying he also kicked in to play the 5150, right? Yes, he did. But you wouldn't need to do that to take somebody to the hospital, would you? I mean, you don't have to. I mean, like if there's somebody who is out there and falls down and hurts themself and looks ill, the police don't say, say, aha, he's sick, I better take him in on a 5150 up to Harborview Hospital or something, and you say, no, why don't you just take him to the hospital? You don't need 5150 to take him to the hospital or another motel, right? I think that's right. I've ruminated on that question quite a bit in this case. Actually, I don't know under California law whether there is authority to take someone involuntarily to the hospital. Well, what was Mr. Landry's, was Mr. Landry willing to go to the hospital? What does the evidence show on that point? I don't think the evidence shows one way or the other on that. And I think that the officer's determination was because of his behavior and the way he was talking, he wasn't rationally capable of making decisions. Well, now, if he had left them on the roadside there, just if he left them, what duties do officers have relative to, you know, if you, well, obviously if you let a drunk driver get back in a car and they kill someone, then the police department is going to get killed, is going to get sued, right? Right. All right. If you just leave someone by the side of the road and, let's say, he wandered out, gets hit by a car, what are the officer's duties or responsibilities to someone that he believes is not safe for himself or others? I think he has to take care of them. I think under California law, he'd have a special relationship if he took his car away. He can't just leave them there if he gets hurt. The officers have changed the situation. He's responsible. Well, nobody would suggest he's going to leave them there. I think the question is, I mean, to me that's preposterous that any officer would just leave him there. The question would be there's a far gap between taking him in on a mental illness hold and just taking him to the hospital or dropping him off at a hotel, or in a different situation, if he had a family in the neighborhood, you'd drop him off at the family. So I think the question we're faced with is not that he was going to leave him by the roadside, but could he have just taken him into the hospital or done something else? Does he need this probable cause 5150 to do something? He did, in fact, take him to the hospital, the records officers, and he was seen by a nurse at the hospital, and the nurse said, take him to the mental hospital. Could I just ask, let's assume you were saying the record doesn't show whether he agreed to go with the officer or disagreed. Had he disagreed with the officer, what options would the officer have had to move him somewhere? In my view, he had two options. If there was evidence of alcohol or drugs, he could arrest him. If there's evidence of a mental disorder, that's what the officer thought, he 5150'd him. If he simply wants to take him someplace safe and Mr. Landry doesn't want to go, the officer doesn't have any authority. We don't have any information. There was no suggestion here that he resisted going to the hospital or that there was even a conversation about it, right? Correct. There's nothing in the record. I want to save your remaining time. I'd like to reserve a minute for rebuttal, if I may. Thank you. Good morning, Your Honors. Again, Diane Ballencourt on behalf of Appellee Malcolm Landry. My colleague stated that the 5150 is disjunctive, i.e. either or. That is absolutely not true. Bias and triplet were clear. For an involuntary mental health commitment to be constitutional, there must be probable cause that the person detained is mentally disordered and is a danger to himself or herself. This is clearly established. It's a both and requirement, and it's not either or. No, I was asking danger to himself or others. That's what I was asking. Oh, that part sticks. Yes. Right, that part is disjunctive. And that's what he said. Mental illness and danger. No, that was not my question. Disjunctive. I'm going to look at the danger prong first. We have in Boyd v. Benton County, I guess, Judge McEwen, you were in on that decision. If a right is clearly established by decisional authority of this circuit, the inquiry should come to an end. And we have a case that is squarely on point. It's Suzuki v. Yen, 617 F2D 173, page 1970. I'm sorry, 178, Ninth Circuit, 1980. Suzuki held that it is unconstitutional to involuntarily commit someone who does not pose an imminent danger to self or others. Now, Officer Berry testified repeatedly that he believed Landry presented a danger to self or others solely because of his driving and that he was not gravely disabled. He also testified to that. And our position is as soon as Landry's car was impounded, any potential danger from his continuing to drive evaporated, did not presently exist. So what was he supposed to do? What was the officer supposed to do? You don't contest that he had the right to impound his car. Well, 5150 is not a convenient alternative to someone who is deprived of their car. He could have taken them to the motel. He could have taken them to the police station to wait. What if he was suggesting the record doesn't show whether it was voluntary or involuntary? What if Mr. Landry had declined to be taken anywhere? What could the officer have done? Well, Judge Ikuda, the officer could have investigated. He could have asked, are you willing to go to the hospital? He could have asked, what is your mental state? How are you feeling? He did ask, how are you feeling medically? Mr. Landry said, oh, I'm feeling just fine. And the officer took from that that Mr. Landry was fine. So could you tell me if Mr. Landry had declined to go, what were the officer's options at that point? Mr. Landry did not decline to go. That's a hypothetical question. He was, the officer testified, he was at all times cooperative. Is that my hypothetical question? He was at all times cooperative with the officer. He did not decline anything. And could you, if he had declined, could you tell me what the options were? The options were to take him to a motel. If he had declined, what were the officer's options? If Mr. Landry had declined to go with the officer? You know, Judge Ikuda, it's said that it's not disputed that the impoundment of the car was appropriate. That's just not an issue that was ever decided, that was ever even brought up in this case. We assume that as a fact. We do not believe the impoundment of the car was appropriate. The officer could have cited he could have done other things. But it's a fact in this case. Had Mr. Landry refused, the officer could have taken him to a motel, police station, bus, hospital, someplace safe. Against his will? Does he have the authority to do that? Well, he's impounded the car and it's he's impounded the car. He's put Mr. Landry in a situation where he needs the officer has an obligation to do something safe. But not a 51-50. I mean, that is taking somebody, involuntarily committing him, depriving him of his liberty. Well, why do you say that it would have been reasonable to take him to a hotel when he was already earlier in the day? That's exactly what happened. He was told to call family to come and get him. I mean, they're getting 911ed off the, you know, that's undisputed. These are people that don't even know Mr. Landry, have no association with Mr. Berry, are calling in that your client's driving erratically. So they do take him to the hotel, say, stay here, get someone to help you, do all of that. He gets back in the car and continues on. There's more damage to his vehicle later. So why do you say taking him to a hotel is something that the officer should have done? Okay. First, as part of the record, it's disputed whether there was more damage to the car later. But more to the point, he was taken to the car, and he still had his keys and he still had his car, and he continued to drive. He asked if there was authority to keep him. He was told there was no authority to keep him, and he had his car. And he was, you know, later reported as an erratic driver. His car is kind of a red herring in a way because you take away his car. But if the officer made a fair judgment that this gentleman is mentally impaired and can be a danger to himself or others through driving, just because you take away his car doesn't mean he's not going to go rent the car or do something else. So I'm wondering why we have focused, you know, what the district court did on the car itself. Why does that necessarily take away the judgment that he could be a danger to himself and others? On account of the car? Right. He had no driver's license. He was not in position to get another car. The prospect of his continuing to drive was virtually eliminated. But Judge McKeown, also in the record, there is nothing in this record that says that Officer Berry considered Mr. Lantry mentally ill until two hours later. I've got 28 admissions regarding Officer Berry regarding the totality of the circumstances that he admits. And Mr. Lantry presented a picture of mental health, not mental disorder. It's only when he arrived two hours later at St. Providence, a psychiatric center, and against the advice of the psychiatric charge nurse who said, oh, I'm not getting any reports of mental health issues here. Do not bring them here. A 5150 is not appropriate. And the officer says, nonetheless, I'm bringing them in. He doesn't say, oh, but Mr. Lantry has mental health issues. He says, nonetheless. And can I recite my 28 admissions by this officer? To what extent does that matter in this sort of case where we're looking at what was objectively reasonable as opposed to the officer's individual perceptions and inferences? It's not objectively reasonable because this officer and I asked not one question about mental health. He had 28 situations. He did not assess that he was mentally ill. That's not an assessment he made. The only assessment, can I read the 28 admissions that he made? He did not assess he was mentally ill at the time. First, he stopped and talked about, Lantry stopped and talked about his answers before speaking. He admitted, Barry understood Lantry's words when he spoke. When he walked, he did so slowly and deliberately. There was nothing unusual about his appearance except for the nasal cannula. He was dressed neatly and appropriately, hair short and not messy. He wasn't dirty, did not smell, did not act upset. He wasn't angry at all. He never threatened Barry, never protested or cursed him. He was polite, courteous, calm throughout, cooperative with all of Barry's instructions. He had no indication he was suicidal, no mention of harming himself or others, said nothing about wanting to die. The search of the car revealed no evidence of intent to harm himself or others, nothing in the car to indicate he had mental illness. What did he say about having numerous oxygen bottles, food and trash in his wallet strewn about in the car? Okay, the officer said that he sees messy cars all the time. It's no big deal. They can be neat as a pin or like pigsty's. He too eats in his car. He admitted the driving conditions were terrible. It was a winding, mountainous road, raining hard, cloudy, dark, rocks in the road, accidents in the vicinity. Did he say he noticed fresh damage to a guardrail, mud in the northbound lanes and torn up grass on the side of the road? The officer never reported what he now claims was a collision by the guardrail. He never investigated. Did he say that he saw that? Did he say that he saw that? Did the officer say he saw that? Yes. Yes, the officer said he saw that. Is there any contrary testimony to that? Mr. Landry denied that in his deposition. He said there were no incidents after he hit the rock earlier in the day and blew the tire. The officer admitted, well, he talked about Mr. Landry repeating himself, but the officer also admitted that this answer of where are you going cemetery was odd to him. So he repeated his question, where are you going? Cemetery Road. Where are you going? Cemetery Road and 101. Where are you going? Cemetery Road, California or Manzanita. The officer repeated the question. It was entirely appropriate for Mr. Landry to answer. Well, it wasn't that there was a cemetery road. He had had erratic driving throughout the day, the fact that he began driving again after being stopped earlier in the day. His car was messy. His driving slowly around the other car to face Barry's car while staying off the highway, the damage to the guardrail on his car, and his request for directions to Cemetery Road. Also, he said he was to travel to Reno, Nevada, to Manzanita, to Oregon, which is northwest corner of Oregon by going to San Francisco and then 101, and then mentioning Cemetery Road. Couldn't a reasonable officer have probable cause? Okay. You need to look at the totality of the circumstances. Well, that's what I'm trying to look at. At the time, and I'm sorry, Judge Callahan. At the time, the officer knew nothing about Mr. Landry's route. All he knew was that there were reports of an erratic driver for the last four hours. He did not know where he was going, and he did not know where he came from. He knew what was on the driver's license. He knew the driver's license was clear. He knew the car was clear. He knew Mr. Landry was never cited for anything earlier in the day. All right. Obviously, just you dispute that the officer had probable cause, but what's your best Supreme Court case, not Ninth Circuit case? What's your best Supreme Court case saying that the officer, you know, what he did was, you know, basically doesn't qualify him for qualified immunity? Okay. Well, since this is … What puts him on notice that he was incompetent or, you know, behaving contrary to Supreme Court precedent? He doesn't need Supreme Court precedent under 1987, does he? No, he doesn't need Supreme Court. Benton talks about that. What we have is a long line of Supreme Court precedent from the 70s that say you can't institutionalize the harmless mentally ill, there has to be danger to self. But that's the general precedent. Since the 70s, there's been not a single case that has found that you can take somebody on an involuntary psychiatric hold unless there is suicide threats, homicide threats, extreme depression, despair, paranoia, hallucinations, delusions, violence and the like, especially coupled with drug or alcohol abuse. And there is not a single exception to this rule since the 70s cases of Humphrey v. Katie, Addington v. Texas, O'Connor v. Donaldson, really well-known cases. Every case cited by my opposing counsel, bias involved threat to kill, someone who was very depressed and delusional. There are some cases that said if where the person has exhibited this behavior, then a 5150 hold is appropriate. I was looking for a case that said, but this behavior is not enough for a 5150 hold. What do you think is the best case for that? Okay, the best case, I've got two cases from other circuits. And, again, Benton says if you don't have a case that has exactly your circumstances, you know, you look to other circuits. They're consistent with Suzuki. I've got Fisher v. Hardin, 398F3D837, 6th Circuit, 2005, five years before, and Bailey v. Kennedy, 349F3D731, 73436, 4th Circuit, 2003. And in Fisher's case especially, there was an elderly man in a folding chair with a rifle. Passersby found this odd and reported a suicide attempt. The officers came. They ordered the man to lay down his rifle. They had to repeat the request. He eventually complied. Once he was separated from the rifle, the officers had no further fear for the safety. Like Landry, he walked slowly, was cooperative, never verbally threatening or abusive, and made no statements about hurting herself or any others. The officer asked no questions, like here, to investigate if he was depressed or suicidal. Nonetheless, those officers seized him, causing cardiac arrest. The court found no probable cause, notwithstanding all that, and denied qualified immunity, holding. It was clearly established you must have probable cause that the person is dangerous to himself or others at the time of the seizure. And Bailey v. Kennedy was discussed in our brief, and I'm running out of time. I just have one last question, and my colleagues may have others, but that has to do with the after-the-fact statement of, I don't know if he's called a charge nurse or administrator, where a few days later he then writes all these notes, which the district court did refer to. If those are not properly before the court, does that change your case? No, because there was no danger. The exhibit I gave you, 8.35 p.m. was the tow, and 9 o'clock p.m. was the 5150. There was 25 minutes where there was no danger. Now, that's the crux of the case. In fact, we think that's enough for the court to rule full esponte for summary judgment for us. I don't have time to argue that. Okay. We have your point on that. Are there other questions? No? Thank you. It does appear I have some more time. No. Actually, that means you've actually gone over your time. Excuse me. I know it gets confusing up here. So thank you very much, and we have your argument in mind, and we have your briefing, and we understand your alternate argument that we could enter judgment for your client. May I just say one more thing, Your Honor, please? You can say one more thing. Okay. The recording confirms, if you listen to the recording, that Ms. Berry was told that Jenkins advised against taking him to the psychiatric hospital. It says negative, not unless mental health issues, and there was no record of mental health issues. Thank you. Mr. Hamilton, I think you have a minute. Very quickly, we don't have to look for out-of-state authority. There are six cases under 5150, state and federal, recited in our brief. Every one of them the court held either there was reasonable cause for the detention or the defendant made a reasonable mistake. There are no cases on the plaintiff's side that would put Officer Berry on notice that he was making an unconstitutional decision. She claims, I think, Suzuki is her best circuit case, and what's your response to that? I'm sorry. I think she cited Suzuki. I don't remember the case. If it was cited in her brief, I think we might have touched upon it. But the problem with that is that the cases that she relied on before were simply said the general proposition, you have to have probable cause for psychiatric detention. We don't disagree with that. But the Supreme Court, most recently in Ashcroft v. Al-Kidd, says you have to have case authority in the specific situation faced by the officer. She cited absolutely none. And a couple of points she mentioned, she said it's disputed whether there was damage to the car later. That's not true. There was definitely damage to the car. It was unexplained. That is, the officer asked dispatch, did he have damage earlier? The dispatcher said, not that we know of. She also said that Officer Berry was told, don't take him to St. Providence. He's not a mental health situation. That's all hearsay. Officer Berry never spoke to St. Providence. That was conversation with the dispatchers. There was no conversation between Officer Berry and St. Providence, the mental hospital. And finally, the point that was the car, the car was taken away, does that eliminate the danger? We know that's not true. He got out of the hospital three days later, driver's license or no driver's license. He got back in his car, got it out of impound, drove all the way to Oregon and back to Reno. So, Judge McKeown, you asked a very good point. Could he get another car? Could he get his own car, whether he had a driver's license or not? Yeah, he did it. All right. Thank you. Thank you both for your arguments today. The case of Landry v. Berry is submitted and we're adjourned for this short session. Thank you.
judges: McKeown, Callahan, Ikuta